The judgment is affirmed as to Harriet S. Pullen and reversed as to Royal R. Pullen, with costs to him.

**PAUL v. BEZ.**

No. 3802.

District Court of Alaska, First Division. Juneau.
March 2, 1940.

Grover C. Winn, of Juneau, for plaintiff.
Faulkner & Banfield, of Juneau, for defendant.

ALEXANDER, District Judge.

This action was tried to the court on the plaintiff's third amended complaint and defendant's answer thereto.

It is alleged in said complaint, in substance, that on December 21, 1933, plaintiff and defendant entered into the written agreement set out in Paragraph I of his complaint, whereby plaintiff was to secure a fish trap location at East Point and the necessary licenses to operate the same, and defendant was to pay all expenses in connection therewith; install and operate a fish trap at said location, and divide the net profits with the plaintiff, after

first reimbursing himself for his expense in that behalf from the profits of the trap.

It is then alleged that pursuant to the terms, conditions and covenants of said agreement, the plaintiff secured from the proper governmental agencies the location provided for in said agreement and their consent to installing a fish trap thereon, and a territorial fish license therefor, and generally did and performed everything necessary on his part to be performed, as provided in said agreement.

He then alleges that on June 3d, 1934, defendant proposed orally that the partnership created by the foregoing contract be continued, and as an inductment offered to supply another fish trap site in lieu of the site at East Point, which site he alleges had been transferred to J. V. Davis and J. A. Berg by him, in accordance with an oral agreement with the defendant; that said East Point site was so transferred for a consideration of one-third of the net proceeds thereof; that the plaintiff thereupon agreed to continue in the partnership.

Plaintiff then alleges that thereupon the defendant proposed that the written contract—set forth in his complaint—be changed to cover Fisheries Point in place of East Point, to all of which the plaintiff agreed, and pursuant thereto that he (plaintiff) endorsed the territorial license for the fish trap at East Point and delivered the same to the defendant upon his promise to have the location changed to Fisheries Point.

Plaintiff then alleges that on June 5, 1934, the defendant requested the Territorial Treasurer to, and he did, transfer said license to cover Fisheries Point, but defendant, "with intent to defraud plaintiff," caused said Treasurer to change the name of the licensee to that of W. A. Castleton, and under the license so transferred thereafter operated the fish trap at said Fisheries Point, and caught therein, during the seasons of 1934, 1935, 1936 and 1937, considerable numbers of salmon which he sold, and converted the proceeds to his own use.

The plaintiff then alleges that he demanded of defendant an accounting of the proceeds of the catch of said trap, but that defendant has failed and refused to render such an accounting.

Wherefore, plaintiff demands that defendant be required to render him an accounting; and to pay him his share of the proceeds of said trap for the years 1934, 1935, 1936 and 1937.

In answer to plaintiff's complaint the defendant admits making the contract of December 21, 1933; admits that plaintiff secured a location and fish trap license for East Point at defendant's expense; admits the East Point location was sold by plaintiff to Davis and Berg; admits the license secured for East Point location was transferred to Fisheries Point location, and generally, denies all the other allegations of plaintiff's complaint.

The substance of the testimony on the part of the plaintiff was that prior to the agreement of December 21, 1933, the plaintiff met the defendant in Seattle and had a conversation with him in which the defendant told him that he had recently seen and had a conversation with Frank T. Bell, then Commissioner of Fisheries, in which Bell told him that several friends of his in Alaska had asked him to do something for Paul and that he would like to do something for them and also like to help Paul out. Bez then explained to Paul that Bell had suggested that Bez get in touch with Paul and if he (Bez) would finance Paul and have Paul make an application for a fish trap location, that he (Bell) would open a location for him. Bell suggested a possible location as "Somewhere along Chatham Strait" near where Bez was operating, and remarked to Bez, "You might get a chance to buy fish from him for your cannery."

It was thereupon agreed between plaintiff and defendant that Paul should make an application for a fish trap location and that Bez would assist him in getting the location, advance the necessary expenses therefor, build a

trap thereon, buy the fish that they hoped to catch, and share equally with Paul the profits of such trap after first being reimbursed for whatever expense he should be put to on that account. Paul says that he knew of no suitable location, but that Bez suggested the location at East Point as being a good location, and Paul made application for, and secured it. After securing this location and before they had put a trap on the site, they learned that someone had already put a trap on this location, and on investigation found that Captain Jim Davis had also secured a permit for the same location and that he had already put a trap on the site. Bez then put a trap alongside the Davis Trap and Paul soon after began a suit against Davis to dispossess him. In this suit it developed that both Davis, and Paul, acting as the Lewis Fish Company, had secured regular permits and licenses for this identical site and as the fishing season had not opened neither of them had any preferential rights to the location. The suit was accordingly dismissed and thereafter Paul, and Davis and Berg, entered into negotiations for a compromise of their rights which resulted in the making of the written agreement of May 22, 1934, between Davis and Berg, and W. L. Paul acting as the Lewis Fish Company, wherein it was agreed that Davis and Berg should have the location, build a trap thereon and pay Paul one-third of the net profits for the trap for his interest therein.

Paul claims that before entering into this contract of May 22, 1934, with Davis and Berg, whereby he relinquished all his interest in the East Point location, he had a conversation with Bez, in which he claims Bez told him that he (Bez) had another location at Fisheries Point, and proposed that they modify their agreement of December 21, 1933, by making said contract cover Fisheries Point instead of East Point; that he (Paul) agreed to this change, and thereafter made the compromise above set out with Davis and Berg, and delivered to Bez the territorial

trap license covering East Point, to be used by Bez to cover the Fisheries Point location.

The allegations of his complaint, however, refute this statement, for it is alleged in Paragraph III of his complaint: "That on June 3, 1934, defendant proposed orally that the partnership created by the foregoing contract be continued, and as an inducement offered to supply another fish trap site in lieu of the site at East Point, which site had already been transferred to J. V. Davis and J. A. Berg by plaintiff; * * * that thereupon the defendant proposed that the above described contract (of Dec. 21, 1933) be changed to cover, not at East Point * * * but at Fishery Point * * *; to all of which the plaintiff agreed."

Now when did such an arrangement as plaintiff claims, occur? He first alleges in his complaint that it occurred "prior" to making the contract of May 22d. Bez, on his part, denies ever having agreed with plaintiff to substitute Fisheries Point for East Point, and says that when he found that Davis and Berg had filed on the East Point location and that Paul had failed in his suit to dispossess them, that he (Bez) notified all the parties concerned that he was through, and quit. This is verified by Captain Davis, a highly reputable citizen, and a totally disinterested witness, in his testimony on that point, as follows:

"Q. Then you made a contract with Mr. Paul? A. Yes.

"Q. That is the one introduced here? A. Yes.

"Q. I want to hand you this and ask if that is the contract? A. Yes sir.

"Q. Mr. Bez was not a party to that contract? A. No.

"Q. Did you have any conversation with Mr. Bez about any interest he might have in the East Point trap? A. I had a conversation with Mr. Bez before I made that agreement with Mr. Paul, in which he stated he was through and would quit any time. 'I'll sell out to you, give

you my total interest.' I said, 'For how much?' He said, 'Nothing, it is yours.' I said, 'Here, take a dollar.' He didn't want it, but I made him take it.

"Q. He never afterward inquired of you concerning the profits, or anything? A. Only in a conversational way." (Tp. pp. 55, 56.)

It does, however, appear that early in the spring of 1934 Bez did mention Fisheries Point to Davis as a possible trade for his claim to East Point, but this was refused by Davis because, as he says, he knew that the Fisheries Point location was then open and that he could have filed on it himself if he had wanted to and that Bez had nothing to trade. Davis' testimony in this respect is found on pages 65, 66 and 67 of the transcript, and occurred weeks or months before the trial of the case of Paul vs. Davis and Berg on May 24th, 1934. It appears from Captain Davis' testimony that he was down in Seattle in the spring of 1934 having a scow built, and that during that time he had several conversations with Bez in regard to settling the difficulties over the East Point trap; that in those conversations Bez told Davis that if he (Davis) would give up his interest in the East Point location, he would use his influence to get Davis a trap elsewhere, in answer to which Davis said, "Where else?" "Well, you name the place." Davis said, "In North Basket Bay." Bez said, "Can't have that." Davis said, "You name it then." Bez then said, "The old Kasko location?" (which is the same as the Castleton or Fisheries Point location). Davis said, "I naturally assumed he had some control over it." Davis was then asked:

"Q. Who was fishing that location before this offer was made to you? A. Kasko fished it under John Tennyson of Tenakee. Mr. Kasko had not fished it for a year or more. The area was open. I could have taken it myself but the reason I didn't was because I thought Kasko was in hard luck and I didn't want to beat him out of the location.

654

"Q. Mr. Bez had never fished it? A. Not up to that time.

"Q. Had Castleton? A. No."

The record shows the War Department permit for Fisheries Point, subsequently issued to W. A. Castleton, was not issued until June 8, 1934, as shown by that document (Defendant's Exhibit "C"), long after the conversation between Davis and Berg as testified to by Davis, which verifies Captain Davis' testimony that the area was open then and remained open until some time after the sale of the East Point location by Paul to Davis and Berg on May 22, 1934. Furthermore, Bez disclaims ever having had any interest in the Fisheries Point location, which he says always belonged to Castleton (Tp. p. 30) and there is no evidence to the contrary.

There is no evidence of any agreement to change the contract of December 21st, 1933, except the unsupported statement of the plaintiff himself, which is refuted by the defendant and Davis and the other recited circumstances in the case.

Paul's sale of the East Point location to Davis and Berg was apparently his own idea and solely for his own benefit.

The alleged subsequent arrangement, involving the oral changes in their written contract of December 21, 1933, testified to by plaintiff as having been entered into by him with the defendant, after plaintiff had sold the East Point location to Davis and Berg, is so improbable and so contrary to the ordinary or usual experiences of mankind, especially when we are expected to believe that the defendant himself proposed it, that it does not ring true to the court, and the court cannot accept it, nor is it supported by the evidence, as we have pointed out.

Furthermore it is incumbent upon Paul, as upon every plaintiff, to prove his case by a preponderance of the evidence, which the court finds he has failed to do.

■ In view of these findings we conclude that Paul had nothing to trade after he sold the East Point location to Davis and Berg, not even a half interest in the territorial fish trap license. That was bought by the defendant, and after the sale of the East Point location by .Paul to Davis and Berg, title to it necessarily reverted to the defendant. Furthermore, even if such an oral agreement as· set forth in plaintiff's complaint and testified to by plaintiff was made, it would have been void under our statute of frauds, as incapable of performance within one year.

Our statute of frauds provides:

"Sec. 4315. *Agreement, not in writing; when void.* In the following cases an agreement is void unless the same, or some note or memorandum thereof expressing the consideration, be in writing and subscribed by the party to be charged or by his lawfully authorized agent:

"*First.* An agreement that by its terms is not to be performed within a year from the making thereof."

The testimony of the plaintiff is that the agreement he claims to have made with the defendant was a continuing agreement whereby he seeks to recover the profits of the Fisheries Point Trap for the years 1934, 1935, 1936 and 1937.

This, however, is of no particular importance here, since the court finds as a fact that there was no consideration for such an agreement and that no such agreement was ever made.

It therefore follows that judgment should be entered for the defendant, with costs, and it is so ordered. Findings and judgment may be prepared accordingly.